UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| MICHAEL CADRETTE;  MARK A. CLAEYS; LAURENCE J. CURLEY; DAVID M. GREGORY; CHARLES A. RICKS; CHERI ALDRICH; DAVID H. BROCK; LISA M. COLLINS; LORI K. CHILDERS; LORRINE COUCH-HART; RICKY SEXTON; FREDERICK J. MASIC II; BARON CATON; LINDA A. COLE; Individually and on behalf of all others similarly Situated | **JURY TRIAL DEMANDED**<br><br>Case No. 19- |

*Plaintiffs,*

vs.

THE 3M COMPANY, f/k/a Minnesota Mining and Manufacturing, Co.; TYCO FIRE PRODUCTS L.P., successor in interest to THE ANSUL COMPANY; BUCKEYE FIRE EQUIPMENT COMPANY; CHEMGUARD, INC.; NATIONAL FOAM, INC., E.I DU PONT DE NEMOURS AND COMPANY, individually and as successor in interest to DuPont Chemical Solutions Enterprise, THE CHEMOURS COMPANY FC, L.L.C., individually and as successor in interest to Dupont Chemical Solutions Enterprise and DYNAX CORPORATION.

*Defendants.*

**CLASS COMPLAINT FOR INJUCTIVE RELIEF, MONEY DAMAGES, AND DEMAND FOR JURY TRIAL**

Plaintiffs, Michael Cadrette, Mark A. Claeys, Laurence J. Curley, David M. Gregory, Charles A. Ricks, Cheri Aldrich, David H. Brock, Lisa M. Collins, Lori K. Childers, Lorrine Couch-Hart, and Ricky Sexton, Frederick J. Masic II, Baron Caton, and Linda A. Cole, individually and on behalf of all others similarly situated, by and through their undersigned counsel, hereby file this Class Action Complaint, and make these allegations based on information and belief against Defendants, THE 3M COMPANY, f/k/a Minnesota Mining and Manufacturing, Co.; TYCO FIRE PRODUCTS L.P., successor in interest to THE ANSUL COMPANY; BUCKEYE FIRE EQUIPMENT COMPANY; CHEMGUARD, INC.; NATIONAL FOAM, INC. E.I. DUPONT DE NEMOURS AND COMPANY, individually and as successor in interest to DuPont Chemical Solutions Enterprise, THE CHEMOURS COMPANY FC. L.L.C., individually and as successor in interest to DuPont Chemical Solutions Enterprise and DYNAX CORPORATION (collectively, "Defendants").

## I.   INTRODUCTION

### A.   THE CONTAMINATION OF OSCODA, MICHIGAN

1.      Wurtsmith Air Force Base ("WAFB") is located in Oscoda, Michigan, Iosco County, approximately 170 miles north of Detroit.

2.      WAFB was established in 1923 under the name Camp Skeel and operated as a landing field and gunnery range.

3.      In 1942 the Camp was renamed Oscoda AAF and became the home of the 134th Army Air Force Base Fighter Unit in 1943.

4.      Oscoda AAF was designated an independent base in July 1944, but later reverted to a sub-base of Selfridge Field at the end of World War II.

5.      The airfield was closed at the end of 1945 and remained inactive until Selfridge again used it for training in 1948.

6.    The name was changed to Oscoda AFB in 1948 and became home to the 2476th Base Services Squadron in December 1948.

7.    The USAF in 1953 announced that WAFB would host a strategic Air Command (SAC) bombardment wing. At this time the state of Michigan leased an additional 311 acres of land to the USAF for new housing and improved flight facilities.

8.    The 379th Bombardment Wing ("BW") moved from Homestead AFB, Florida, to WAFB in January 1961 and begun combat missions in Vietnam in 1969.

9.    WAFB was recommended for closure by the BRAC of 1991, and officially closed on June 30, 1993.

10.    As part of the fire training exercises, WAFB used Aqueous Film Forming Foam ("AFFF") and other materials containing Per- and Polyfluoroalkyl Substances ("PFAS"), including perfluorooctanesulfonic acid ("PFOS") and related fluorochemicals that can degrade to perfluorooctanoic acid ("PFOA") or PFOS.

11.    AFFF has been linked to the contamination of surface and groundwater with PFOA, PFOS and other PFAS throughout the country.

12.    While the base was operational, hazardous PFAS materials were released into the environment, resulting in the contamination of Plaintiffs' and putative Class Members' homes and persons.

13.    Contaminants from WAFB and the surrounding area migrated beyond the base's boundaries contaminating water sources in the city of Oscoda reaching Plaintiffs' homes and causing them significant personal injuries and property damage.

14.    WAFB was closed in June 1993, after 70 years of operation as an aviation support facility.

15.     The community of Oscoda is located downgradient of WAFB. As a direct and proximate result of the use of Defendants' AFFF products containing PFAS at WAFB, Oscoda's drinking water supply has been contaminated with elevated levels of PFAS.

16.     Plaintiffs and putative Class Members receive their potable water from private wells, or a municipal water provider.

17.     PFAS that was used, and subsequently released from WAFB, have contaminated numerous private wells relied upon by Plaintiffs and putative Class Members.

18.     PFAS, specifically PFOA and PFOS, has been detected in levels exceeding the current U.S. Environmental Protection Agency ("EPA") Health Advisory Limit of 70 parts per trillion ("ppt") in private wells that provide water to Oscoda's residents.

19.     Investigations by the Air Force have concluded that the basis for this widespread contamination of the groundwater is decades of use, storage, and disposal of AFFF at WAFB that contained PFAS.[1]

20.     Several studies and assessments conducted by the Michigan Department of Environmental Quality ("MDEQ"), DLZ Corporation, Amec Foster Wheeler, and the United States Airforce ("USAF"), have confirmed the widespread PFAS contamination of the groundwater resources for the Oscoda community (hereafter "Areas of Investigation").

21.     Defendants manufactured and distributed AFFF containing PFAS to WAFB knowing that these products presented an unreasonable risk to human health and the environment and was inherently dangerous.

---

[1] Action Memorandum for an Emergency Removal of PFOA and PFOS-Contaminated Private Drinking Water Oscoda, Michigan Former Wurtsmith Air Force Base; May 2018.

22.     Defendants also knew that PFOA and PFOS used in their AFFF products were highly soluble and mobile in water, highly likely to contaminate water supplies and other sensitive receptors, were persistent in the environment, and would bio-accumulate in humans causing serious health effects.

23.     Defendants marketed and sold their products with knowledge that large quantities of AFFF, containing toxic PFAS, would be used in training exercises and in emergency situations at military bases, including WAFB in such a manner that PFOA and PFOS would contaminate the air, soil and groundwater.

24.     The Defendants marketed and sold their products with knowledge that large quantities of AFFF, containing toxic PFAS, would be stored in fire suppressant systems and tanks on USAF Bases, including WAFB, and that such systems and storage were used and maintained is such a manner that dangerous chemicals would be released into the air, soil, and groundwater.

25.     The Defendants failed in their duty to warn users, bystanders and sensitive receptors of the inherently dangerous properties of their AFFF products.

26.     The Putative Class represents past and present residents of Oscoda who were exposed to drinking water contaminated with PFAS, and who have suffered a bioaccumulation of PFAS, including but not limited to PFOA and PFOS, in their bodies.

**B.      Health Effects of PFOS and PFOA Exposure**

27.     Scientific studies of PFOA and PFOS and have concluded that exposure to PFOA and PFOS are associated with the development of numerous serious medical conditions.

28.     PFOA, sometimes identified as C8 due to the common presence of eight carbons in the PFOA molecule, was the subject of a study formed out of a class action settlement arising

out of water contamination from DuPont's Washington Works located in Wood County, West Virginia.

29.     The C8 panel consisted of three epidemiologists specifically tasked with determining whether there was a probable link between PFOA exposure and human diseases.

30.     In 2012, the panel found probable links between PFOA and kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, pregnancy induced hypertension (including preeclampsia), and hypercholesterolemia.

31.     In May 2015, based on concerns about the production and release of PFOA into the environment, scientists and other professionals from a variety of disciplines issued the "Madrid Statement on Poly- and Perfluoroalkyl Substances (PFASs)," a policy statement calling for greater regulation, restrictions, and limits on the manufacture and handling of any product containing PFOA, as well as the development of safe, non-fluorinated alternatives to these products to avoid long-term harm to human health and the environment.[2]

32.     In May 2016, the USEPA issued Lifetime Health Advisories advising against lifetime PFOA and PFOS exposure above 70 ppt.[3]

33.     The USEPA's 70 ppt limit was designed to protect the population at large from exposure to harmful concentrations of PFOA and PFOS in drinking water above which adverse health effects are anticipated to occur, based on available information.

---

[2] Blum A, Balan SA, Scheringer M, Trier X, Goldenman G, Cousins IT, Diamond M, Fletcher T, Higgins C, Lindeman AE, Peaslee G, de Voogt P, Wang Z, Weber R. 2015. The Madrid statement on p oly-and perfluoroalkyl substances (PFASs). Environ Heallth perpect 123: A107-A111; http://dx.doi.org/10.1289/ehp.1509934.

[3] Lifetime Health Advisories and Health Effects Support Documents for Perfluorooctanoic Acid and Perfluorooctane Sulfonate, 81 Fed. Reg. 101 (May 25, 2016).

34.     Many states, however, have issued lower regulatory limits. For example, Vermont has set a combined level of 20 ppt for PFOA and PFOS and New Jersey has set a maximum contaminant level of 14 ppt for PFOA.

35.     In 2016, the National Toxicology Program of the United States Department of Health and Human Services ("NTP") and the International Agency for Research on Cancer ("IARC") both released extensive analyses of the expanding body of research regarding the adverse effects of PFAS. The NTP concluded that both PFOA and PFOS are "presumed to be an immune hazard to humans" based on a "consistent pattern of findings" of adverse immune effects in human (epidemiology) studies and "high confidence" that PFOA and PFOS exposure was associated with suppression of immune responses in animal (toxicology) studies.[4]

36.     The IARC concluded that there is "evidence" of "the carcinogenicity of . . . PFOA" in humans and in experimental animals, meaning that "[a] positive association has been observed between exposure to the agent and cancer for which a causal interpretation is . . . credible."[5]

37.     On November 10, 2017, California listed PFOA and PFOS as chemicals known to the state to cause reproductive toxicity, pursuant to Proposition 65, The Safe Drinking Water and Toxic Enforcement Act of 1986.

---

[4] *See* U.S. Dep't of Health and Human Services, Nat'l Toxicology Program, *NTP Monograph: Immunotoxicity Associated with Exposure to Perfluorooctanoic Acid or Perfluorooctane Sulfonate* (Sept. 2016), at 1, 17, 19, https://ntp.niehs.nih.gov/ntp/ohat/pfoa_pfos/pfoa_pfosmonograph_508.pdf.

[5] *See* Int'l Agency for Research on Cancer, IARC Monographs: *Some Chemicals Used as Solvents and in Polymer Manufacture* (Dec. 2016), at 27, 97, http://monographs.iarc.fr/ENG/Monographs/vol110/mono110.pdf.

38.     In November 2017, Congress passed the National Defense Authorization Act ("NDAA"), legislation which set aside $42 million to remediate PFOA and PFOS contamination from military bases. As part of the NDAA, an additional $7 million was devoted to the Investing in Testing Act, which authorizes the Centers for Disease Control and Prevention ("CDC") to conduct a study into the long-term health effects of PFOA and PFOS exposure.

39.     Michigan currently follows the USEPA level of 70 ppt combined for PFOA and PFOS levels.

###     C.     Plaintiffs' and the Putative Class' Exposure and Damages

40.     Years of ingestion of Oscoda's contaminated drinking water has significantly exposed unknowing residents to PFAS at concentrations hazardous to their health.

41.     Plaintiffs have been injured as a result of receiving and/or consuming water with elevated levels of PFAS, including PFOA and PFOS, for years.

42.     Plaintiffs have been injured due to consumption of PFC contamination of the water supplies caused by Defendants' manufacture, distribution, and sale of AFFF. In addition to personal injury and property damage, Plaintiffs are at a significantly increased the risk of contracting serious latent diseases.

43.     Plaintiffs and the Putative Class seek recovery from all Defendants for damage to their person and property, and seek injunctive relief to establish medical monitoring to provide health care and other appropriate services to the Class members for a period of time deemed appropriate by the Court.

###     II.     JURISDICTION AND VENUE

44.      This Court has subject matter jurisdiction over this civil action pursuant to the 28 U.S.C § 1332 (a)(1) and (d) (2) in that this action seeks monetary relief in excess of

$5,000,000.00 exclusive of interests, costs and attorney's fees and is between citizens of different states.

45.     This Court has jurisdiction over Defendants pursuant to MCL 600.711

46.     Venue is proper in this court as Plaintiffs' and Class Members claim arose in this judicial district, in Oscoda, Iosca County, pursuant to 28 U.S.C. §§102,1391(b).

## III.   THE PARTIES

### A.     Plaintiffs and Class Representative

47.     Plaintiff Michael Cadrette is a former resident of Oscoda, Michigan, who currently resides at 28017 Greater Mack St. Clair Shores Michigan 48081. Mr. Cadrette lived throughout Oscoda, during the time of 1984 to 1992. From June 1984 to August 1984, he resided at 202 Evergreen; from August 1984 through September 1986 he resided at 1074 Killmaster Dr.; and from September 1986 through September 1992 he resided at 8809 H.N. Vermont, WAFB MI 48753.

48.     Plaintiff Michael Cadrette trained to fight fires at the fire pit in WAFB where he was in direct contact with the AFFF used.

49.     As a direct and proximate result of consumption of drinking water contaminated with Defendants' AFFF used at WAFB, and direct exposure to PFCs through his years of training with AFFF at WAFB, he has been diagnosed with liver problems, high cholesterol, high blood pressure and fertility problems, and he is at a significantly increased risk of developing serious latent diseases, including but not limited to effects on the immune system, changes in thyroid hormone, ulcerative colitis, and testicular and kidney cancer.

50.     Plaintiff Mark A. Claeys is a former resident of Oscoda, Michigan who currently resides at 885 W. Birch Ln. Wichita, Kansas 67212. Mr. Claeys worked as an Active Duty Air

Force Airman, performing Avionics on B-52G and KC-135A Aircrafts, at WAFB from October 1985 through August 1992.

51.     As a direct and proximate result of the consumption of drinking water contaminated with Defendants' AFFF containing PFAS used at WAFB, Plaintiff Mark A. Claeys has been exposed to elevated levels of PFCs. As a result of his exposure to the contaminated water supply, Mr. Claeys has been diagnosed with liver problems, hyperlipidemia, hypothyroidism, and he is at a significantly increased risk of developing serious latent diseases, including but not limited to effects on the immune system, changes ulcerative colitis, high blood pressure, and testicular and kidney cancer.

52.     Plaintiff Laurence J. Curley is a former resident of Oscoda, Michigan, who currently resides at 810 Wickham Lakes Dr. Viera, Florida resided at 6465 Loud Dr. Oscoda, Michigan from 1964 to 1984. This residence is located directly across Van Etten Lake across from WAFB.

53.     As a direct and proximate result of consumption of drinking water contaminated with the Defendants' AFFF containing PFAS used at WAFB, Plaintiff Laurence J. Curley has been exposed to elevated levels of PFAS. As a result of his exposure to the contaminated water supply, Mr. Curley has been diagnosed with liver disease, thyroid disease, high cholesterol, and high blood pressure, and is at a significantly increased risk of developing serious latent diseases, including but not limited to effects on the immune system, ulcerative colitis, and testicular and kidney cancer.

54.     Plaintiff David M. Gregory is a former resident of Oscoda, Michigan, who currently resides at 220 A Hart Street, Taunton, Massachusetts 02780. Mr. Gregory resided at Wurtsmith Airforce Base from 1983 to 1987 and served as a B52G Crew Chief.

55.     As a direct and proximate result of consumption of drinking water contaminated with Defendants' AFFF containing PFAS used at WAFB, Plaintiff David M. Gregory has been exposed to elevated levels of PFAS. As a result of his exposure to the contaminated water supply, Mr. Gregory has been diagnosed with testicular cancer, thyroid disease, and high cholesterol, and is at a significantly increased risk of developing other serious latent diseases, including but not limited to effects on the liver and immune system, ulcerative colitis, high blood pressure, and kidney cancer.

56.     Plaintiff Charles A. Ricks is a former resident of Oscoda, Michigan who currently resides at 1007 Howard Avenue Unit 45 Escondido, California. Mr. Ricks lived at the WAFB Barracks from 1975 to 1978.

57.     As a direct and proximate result of consumption of drinking water contaminated with Defendants' AFFF containing PFAS used at WAFB, Plaintiff Charles A. Ricks has been exposed to elevated levels of PFAS. As a result of his exposures he has been diagnosed with liver disease, thyroid disease, high cholesterol, and high blood pressure.

58.     Plaintiff Cheri Aldrich is a former resident of Oscoda, Michigan who currently resides at 432 Benton St. Anoka, Minnesota. From 1967 to 1987, Mrs. Aldrich resided at 5242 US 23 Oscoda Michigan 48750.

59.     As a direct and proximate result of consumption of drinking water contaminated with Defendants' AFFF containing PFAS used at WAFB, Plaintiff Cheri Aldrich has been exposed to elevated levels of PFAS. As a result of her exposures she has been diagnosed with thyroid problems and reproductive problems, and is at a significantly increased risk of developing serious latent diseases, including but not limited to effects on the liver and immune system, ulcerative colitis, high cholesterol, high blood pressure, and kidney cancer.

60.     Plaintiff David H. Brock is a former resident of Oscoda MI who currently resides at 5316 Woodcreek Trail Clarkson, Michigan 48346. Mr. David H. Brock resided at WAFB from 1980 to 1982 while he was in the Air Force.

61.     As a direct and proximate result of consumption of drinking water contaminated with Defendants' AFFF containing PFAS used at WAFB, Plaintiff David H. Brock has been exposed to elevated levels of PFAS. As a result of his exposures he has been diagnosed with liver disease, high cholesterol, and ulcerative colitis and he is at a significantly increased risk of developing serious latent diseases, including but not limited to effects on the immune system, changes in thyroid hormone, high blood pressure, and testicular and kidney cancer.

62.     Plaintiff Lisa M. Collins is a former resident of Oscoda Michigan who currently resides at 8930 W. State Road 84, #135 Davie, Florida 33324. Ms. Collins was born in 1967 and lived from her birth until 1982 at 6465 Loud Drive, Oscoda, Michigan 48750. In 1982, she moved to AuSable Street, Oscoda Michigan 48750 and lived at this address until 1986. Ms. Collins regularly visits her family in Oscoda.

63.     As a direct and proximate result of the consumption of Defendants' AFFF used at WAFB, Plaintiff Lisa M. Collins has been exposed to elevated levels of PFAS. As a result of her exposure to the contaminated water supply, Ms. Collins has been diagnosed with thyroid disease, high cholesterol, and she is at a significantly increased risk of developing serious latent diseases, including but not limited to effects on the liver and immune system, ulcerative colitis, high blood pressure, and kidney cancer.

64.     Plaintiff Lori K Childers is a former resident of Oscoda, Michigan who currently resides at 428 Childers St. Pensacola, Florida 32534.

65.     As a direct and proximate result of consumption of drinking water contaminated with Defendants' AFFF containing PFAS used at WAFB, Plaintiff Lori K. Childers has been exposed to elevated levels of PFAS. As a result of her exposure to the contaminated water supply, Ms. Childers has been diagnosed with high blood pressure, pregnancy problems, liver problems and high cholesterol,  and she is at a significantly increased risk of developing serious latent diseases, including but not limited to effects on the immune system, changes in thyroid hormone, ulcerative colitis, and kidney cancer.

66.     Plaintiff Lorrine M. Couch-Hart is a former resident of Oscoda, Michigan who currently resides at 109 Armstrong Street, LaFontaine, Indiana 46940. From 1983 to 1986, Mrs. Couch-Hart resided at 9817 B. Minnesota St., WAFB Michigan 48750.

67.     As a direct and proximate result of consumption of drinking water contaminated with Defendants' AFFF containing PFAS used at WAFB, Plaintiff Lorrine M. Couch-Hart has been exposed to elevated levels of PFAS. Plaintiff Lorrine M. Couch-Hart has been diagnosed with liver issues, high cholesterol, and pregnancy problems, and she is at a significantly increased risk of developing serious latent diseases, including but not limited to effects on the immune system, changes in thyroid hormone, ulcerative colitis, high blood pressure, and kidney cancer.

68.     Plaintiff Ricky Sexton is a former resident of Oscoda, Michigan who currently resides at 629 Maplewood St. Willard, Ohio 44890. From 1980 to 1984, Mr. Sexton was a member of the United States Airforce and was stationed at WAFB.

69.     As a direct and proximate result of the consumption of contaminated drinking water contaminated with Defendants' AFFF containing PFAS used at WAFB, Plaintiff Ricky Sexton has been exposed to elevated levels of PFAS. As a result of his exposure to the

contaminated water supply, he has been diagnosed with high blood pressure, and he is at a significantly increased risk of developing serious latent diseases, including but not limited to effects on the liver and immune system, changes in thyroid hormone, ulcerative colitis, high cholesterol, and testicular and kidney cancer.

70.     Plaintiff Frederick J. Masic II is a former resident of Oscoda, Michigan who currently resides at 67 State Street Norwalk, Ohio 44857.Mr. Masic resided at WAFB for 5 years during his time as a military active duty.

71.     As a direct and proximate result of consumption of drinking water contaminated with Defendants' AFFF containing PFAS used at WAFB, Plaintiff Frederick J. Masic II has been exposed to elevated levels of PFAS. As a result of his exposure to the contaminated water supply, he has been diagnosed with liver disease, thyroid disease, high cholesterol, high blood pressure, and is at a significantly increased risk of developing serious latent diseases, including but not limited to effects on the immune system, ulcerative colitis, and testicular and kidney cancer.

72.     Plaintiff Baron Caton is a former resident of Oscoda, Michigan who currently resides at 12625 FM 1170 Blackwell, Texas. Mr. Caton resided at WAFB from 1987-1993 at 9708A 7th Street WAFB.

73.     As a direct and proximate result of the consumption of drinking water contaminated with Defendants' AFFF containing PFAS used at WAFB, Plaintiff Baron Caton has been exposed to elevated levels of PFAS. As a result of his exposure to the contaminated water supply, he has been diagnosed with kidney cancer, and ulcerative colitis, and he is at a significantly increased risk of developing serious latent diseases, including but not limited to effects on the liver and immune system, changes in thyroid hormone, and testicular cancer.

74.     Plaintiff Linda A. Cole is a former resident of Lincoln, Michigan, who currently resides at E 4450 St. Rd. M 28 Autrain, Michigan 49806.

75.     Plaintiff Linda A. Cole spent every weekend or more down the road from WAFB where she was exposed to the PFAS contaminated water.

76.     As a direct and proximate result of the consumption of drinking water contaminated with Defendants' AFFF containing PFAS used at WAFB, Plaintiff Linda A. Cole has been exposed to elevated levels of PFAS. As a result of her exposure to the contaminated water supply she has been diagnosed with thyroid cancer, high cholesterol, and pregnancy problems, and she is at a significantly increased risk of serious latent diseases such as ulcerative colitis and kidney disease.

**B.     Defendants**

77.      When reference is made in this Complaint to any act or omission of any of the Defendants, it shall be deemed that the officers, director, agents, employees, or representatives of the Defendants committed or authorized such actor or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their duties, employment or agency.

78.     The term "Defendant" or "Defendants" refers to all Defendants named herein jointly and severally.

79.     Upon information and belief, each of the Defendants are responsible, negligently, intentionally and/or in some actionable manner, for the events and happenings referred to herein, and caused and continue to cause injuries and damages legally thereby to Plaintiffs, as alleged, either through each Defendant's own conduct or through the conduct of their agents, servants or

employees, or due to the ownership, maintenance or control of the instrumentality causing them injury, or in some other actionable manner.

80.     Defendant The 3M Company (f/k/a Minnesota Mining and Manufacturing Company) (hereinafter "3M") is, upon information and belief, a Delaware corporation with its principal place of business at 3M Center, St. Paul, Minnesota 55133 and does business throughout the United States including conducting business in Michigan. 3M designed, manufactured and sold AFFF used for training and to fight fires at numerous military bases and other locations throughout the country including WAFB.

81.     Defendant 3M is an American multinational corporation that was founded in 1902 as the Minnesota Mining and Manufacturing Company. With approximately $30 billion in annual net sales, 3M employs approximately 90,000 people. Operates in approximately 70 countries and produces more than 55,000 products.

82.     Beginning before 1970 and until at least 2002, 3M manufactured, distributed, and sold AFFF containing PFOS.

83.     3M was the only company that manufactured or sold AFFF containing PFOS.

84.     3M manufactured and/or distributed and/or sold AFFF foam containing PFOS which was used at WAFB.

85.     Defendant Tyco Fire Products L.P., as successor in interest to The Ansul Company (hereinafter "Tyco") is a Delaware corporation having a principal place of business at 1400 Penn brook Parkway, Landsdale, Pennsylvania 19446. Tyco is an indirect subsidiary ultimately wholly owned by Johnson Controls International plc and Irish public listed on the New York Stock Exchange [NYSE: JCI].

86.     Upon information and belief, Defendant Tyco is the successor in interest to the corporation formerly known as the Ansul Company ("Ansul"). Hereinafter, Ansul and/or Tyco as the successor in interest to Ansul will be referred to collectively as "Tyco/Ansul."

87.     Beginning in or around 1975, Ansul designed, manufactured and distributed AFFF that contained fluorocarbon surfactants containing PFOA for training and to fight fires at numerous military bases and other locations throughout the country, including Wurtsmith Air Force Base.

88.     After Tyco acquired Ansul in 1990, Tyco/Ansul continued to manufacture, distribute and sell AFF that contained fluorocarbon surfactants containing PFOA.

89.     Tyco/Ansul manufactured and/or distributed and/or sold AFFF foam containing PFOA which was used at WAFB.

90.     Defendant Buckeye Fire Equipment Company ("Buckeye") is a foreign corporation organized and existing under the laws of the state of Ohio, with its principal place of business at 110 Kings Road, Kings Mountain, North Carolina 28086.

91.     Buckeye manufactured, distributed and/or sold AFFF containing PFOA which was used at the WAFB.

92.     Defendant Chemguard is a Wisconsin corporation with its principal place of business at One Stanton Street, Marinette, Wisconsin 54143.

93.     Beginning in or around 1994, Chemguard began manufacturing AFFF that contained PFOA.

94.     Chemguard manufactured and/or distributed and/or sold AFFF foam containing PFOA which was used at the WAFB.

95.     Defendant National Foam, Inc. (a/k/a/ Chubb National Foam) (collectively "National Foam") is a Delaware corporation, having a principal place of business at 144 Junny Road, Angier, North Carolina 27501.

96.     At all times relevant, National Foam designed, manufactured, and sold AFFF used in training operations and for emergency fire-fighting situations including at the WAFB.

97.     Du Pont Chemical Solutions Enterprise was a Delaware Corporation, with a principal place of business located at 1007 Market Street Wilmington, Delaware 19898

98.     DuPont Chemical Solutions Enterprise was a member of the Telomer Research Program ("TRP"). As a member, it was required to provide a list and volume of products it was selling in the United States on a yearly basis.

99.     In a letter addressed to the Office of Pollution Prevention and Toxics (OPPT) Document Control Office, dated May 14,2003 and signed by Stephen H. Korzenuiwski, DuPont provided its Telomer-based sales products in the United States for the year 2002.

100.    The letter, which was redacted and sent to the EPA under its PFOA Stewardship Program, included Aqueous Firm Fighting Foam (AFFF) sales volume, on an active ingredient pound basis, as well as its Chemical Abstracts Services (CAS) number and chemical name, and is included in the PFOA Stewardship Program Docket.[6]

101.    At all times relevant, DuPont Chemical Solutions Enterprise designed, manufactured and sold AFFF and/or the PFAS constituents in AFFF, that was used in training operations and for emergency firefighting situations at WAFB.

102.    Defendant, E.I. Du Pont De Nemours & Co. ( "DuPont"), successor in interest to DuPont Chemical Solutions Enterprises, is a Delaware Corporation and does business throughout

---

[6] https://www.regulations.gov/docket?D=EPA-HQ-OPPT-2006-0621.

the United States, including conducting business in Michigan. Its principal place of business is 974 Centre Road, Wilmington Delaware 19805.

103.    At all times relevant, DuPont designed, manufactured and sold AFFF and/or the PFAS constituents in AFFF, that was used in training operations and for emergency firefighting situations at WAFB.

104.    Defendant Chemours Company, successor in interest to DuPont Chemical Solutions Enterprise, is a Delaware Corporation and conducts business throughout the United States, including conducting business in Michigan. Its principal place of business is 1007 Market Street, Wilmington, Delaware, 19899.

105.    Defendant the Chemours Company FC, L.L.C., successor in interest to DuPont Chemical Enterprise, is a Delaware Corporation and conducts business throughout the United States including conducting business in Arizona. Its principal place of business is 1007 Market Street, Wilmington, Delaware, 19899.

106.    At all times relevant, Chemours Company FC, L.L.C. designed, manufactured and sold AFFF and/or the PFAS constituents in AFFF, that was used in training operations and for emergency firefighting situations at WAFB.

107.    Defendant Dynax Corporation is a Delaware Corporation that conducts business throughout the United States, including business in Michigan. Its principal place of business is 103 Fairview Park Dr. Elmsford, New York, 10523-1544.

108.    In 1991 Dynax Corporation entered the AFFF business, quickly becoming a leading global producer of fluorosurfactants and fluorochemical foam stabilizers used in firefighting foam agents. At all times relevant, Dynax designed, manufactured and sold AFFF and/or the PFAS constituents in AFFF, that was used in training operations and for emergency firefighting situations at WAFB.

## IV.  FACTUAL ALLEGATIONS AS TO ALL COUNTS

109.   AFFF formulations are chemical mixtures used to extinguish hydrocarbon fuel-based fires.

110.   Some fluorinated surfactants have properties that cause them to not biodegrade and to bioaccumulate and become toxic to animals and humans.

111.   AFFF is a Class-B firefighting foam. It is mixed with water and used to extinguish fires that are difficult to fight, particularly those that involve petroleum or other flammable liquids.

112.   AFFF was introduced commercially in the mid-1960s and rapidly became the primary firefighting foam in the U.S. and in many parts of the world.

113.   AFFF is synthetically formed by combining fluorine free hydrocarbon foaming agents with surfactants. When mixed with water, the resulting solution produces an aqueous film that spreads across the surface of the hydrocarbon fuel. This film provides fire extinguishment and is the source of the designation aqueous film forming foam.

114.   Defendants designed, manufactured, and sold AFFF containing PFAS that was used at WAFB.

115.   Fluorosurfactants used in 3M's AFFF were produced by a unique and patented process known as electrochemical fluorination ("ECF"). The ECF process resulted in product that contains PFOS, some of which degrades into PFOA.

116.   3M began producing PFOS via ECF in 1947.

117.   3M was the only company to manufacture PFOS-containing AFFF.

118.   In 1951, 3M began selling its PFOS and PFAS to other chemical companies including DuPont.

119.    In an attempt to limit liability, 3M opted to stop producing PFOS in 2002 because it was aware of the looming chemical exposure and health effects on the public.

120.    PFOA is a man-made, manufactured chemical not found in nature. PFOA was used to make household and commercial products that resist heat and chemical reactions, and has many uses, including repelling oil, stains, grease, and water.

121.    Other companies such as defendants Tyco/Ansul, Buckeye, National Foam, and Chemguard began manufacturing AFFF using PFAS and PFOA that they produced themselves or purchased from other companies. Defendants' AFFF was then sold to the United States Air Force for use at Air Force bases across the nation, including WAFB.

122.    The chemical structure of PFOA and PFOS makes them resistant to environmental degradation, therefore they are persistent when released into the environment.

123.    PFAS such as PFOA and PFOS have been found to bioaccumulate in humans and animals. In 2005, the U. S. Department of Health and Human Services found that "human exposure to PFOA and PFOS lead to the buildup of these chemicals in the body".

124.    As early as the 1960s, 3M knew that PFOS and PFOA were stable, persistent in the environment, and do not degrade.

125.    Early studies showed that PFAS accumulated in the human body and were "toxic." There were studies from the 1970s conducted by 3M that concluded that PFAS were "even more toxic" than previously believed.

126.    Upon information and belief, by the 1970's, 3M knew that PFOA and PFOS were widely present in the blood of the general U.S. population.

127.    Upon information and belief, 3M concealed this knowledge from the public and government regulators.

128.    In or about 1977, Tyco/Ansul became aware of the environmental and toxic concerns of it AFFF and undertook a study and investigation on more environmentally improved AFFF.

129.    PFAS is readily absorbed by the body through consumption and inhalation.

130.    PFAS accumulates primarily in the blood stream, kidneys and liver.

131.    Because of its toxicity, eight major PFOA manufacturers agreed to participate in the U.S. Environmental Protection Agency's ("EPA") PFOA Stewardship Program.

132.    Participating companies made a voluntary commitment to reduce product content and facility emissions of PFOA and related chemicals by 95% as of 2010.

133.    PFOA can remain in the environment and water for many years and can move through air and soil into groundwater.

134.    Human studies show associations between increased levels of PFOA in the blood and increased risk of conditions such as: high cholesterol, change in thyroid hormone, ulcerative Colitis, pre-clampsia, kidney cancer, and testicular cancer.

135.    These injuries can occur months or years after the exposure to the PFOA.

136.    PFOA's extreme persistence in the environment, along with its toxicity, mobility, and bioaccumulation potential, pose a threat to human health and the environment.

## V.    AFFF USAGE AT WURTSMITH AIR FORCE BASE

137.    Upon information and belief, Defendants each manufactured AFFF containing PFAS for sale to the Department of Defense or the US Air Force with knowledge that it would be used in training and emergency fire-fighting situations.

138.    Upon information and belief, Defendants sold their AFFF products for use at WAFB.

139.    At any given time, WAFB stored and used thousands of gallons of AFFF concentrate during fire training activities. This AFFF was designed, manufactured, and sold by each of the Defendants.

140.    For decades, USAF personnel conducted training exercises at WAFB including firefighting training that used AFFF designed, manufactured and sold by each of the Defendants.

141.    AFFF was released into the environment, air, soil and groundwater at locations that include but are not limited to Fire Training Site 1 ("FT-1") and Fire Training Site 2 ("FT-2").[7]

142.    AFFF was additionally introduced into the environment and groundwater via aircraft hangers containing fire suppressions systems utilizing that use AFFF.

143.    AFFF was also released into the air, soil and groundwater during function testing of the fire suppression systems.

144.    FT-2 conducted fire training exercises from 1958 to 1982. In 1982, a concrete pit was built, and trainings were conducted in the pit. These fires where ultimately put out using AFFF that was released into the soil, air and groundwater.[8]

145.    As a direct and proximate result of the failure to warn the USAF, or local sensitive receptors, the AFFF and all its chemical components, including PFAS, entered the air, soil and groundwater and ultimately the Plaintiffs' and the Putative Classes' water supply and persons.

---

[7] Installation Restoration Program Phase I-Records Search Wurtsmith AFB, Michigan; April 1985.

[8] Installation Restoration Program Phase II- Confirmation/Quantification Stage 1 Wurtsmith Air Force Base, Michigan: Investigation of Ground-Water and soil contamination at selected sites; September 1991.

146.     Upon information and belief, instructions, warning labels and material safety data sheets ("MSDS") that were provided with the AFFF by the Defendants, did not reasonably nor adequately describe the health and environmental hazards of AFFF, which Defendants knew or should have known at the time of sale.

147.     A May 2018 document title "Action Memorandum for a Emergency Removal of PFOA and PFOS-Contaminated Private Drinking Water Oscoda, Michigan Former Wurtsmith Air Force Base" confirmed the significant PFAS contamination in Oscoda, and stated that the contamination distribution pattern was consistent with the groundwater flow direction at WAFB.[9]

## VI.     AFFF CONTAINING PFAS IS FUNGIBLE AND COMMINGLED IN THE GROUNDWATER

148.     Once it has been released to the environment, AFFF containing PFAS once it has been released to the environment, lacks characteristics that would enable identification of the company that manufactured that batch of AFFF.

149.     The process of manufacture and distribution of AFFF, including that which contains PFOA and/or PFOS, includes complex arrangements whereby Defendants sell product for delivery through the Department of Defense, the USAF, specific installations, and/or third-party logistic intermediaries throughout the country, including to WAFB.

150.     A subsurface plume, even if it comes from a single location, such as a retention pond or fire training area, originates from mixed batches of AFFF coming from different manufacturers.

---

[9] Action Memorandum for an Emergency Removal of PFOA and PFOS-Contaminated Private Drinking Water Oscoda, Michigan Former Wurtsmith Air Force Base; May 2018.

151.    The contamination at WAFB is typical: even though several areas where located at the base where the AFFF was used and entered the groundwater, neither the federal or state investigators could determine the identity of the manufacturers whose AFFF containing PFAS contributed to the resulting groundwater contamination plume.

152.    Precise identification of the specific manufacturer of any given AFFF that was the source of PFAS found in a Plaintiffs' and Putative Class Members' blood, a water well, or the groundwater is impossible, Plaintiff must pursue all Defendants jointly and severally, for those indivisible injuries which Defendants have collectively caused upon Plaintiffs and the Class.

153.    Defendants are also jointly and severally liable because they conspired to conceal the true toxic nature of PFAS, to profit from the use of AFFF containing PFAS, at Plaintiffs' and the Classes' expense, to contaminate Plaintiffs' and the Classes' water supply, and to attempt to avoid liability for such contamination of the groundwater and poisoning of the Plaintiffs and the Class.

## VII.    MARKET SHARE LIABILITY, ALTERNATIVE LIABILITY, CONCERT OF ACTION, ENTERPRISE LIABILITY

154.    Defendants in this action are manufacturers that control a substantial share of the market for AFFF-containing PFAS in the United States and are jointly responsible for the contamination of the groundwater and the Communities and for causing the damages and injuries alleged in this Complaint. Market share liability attaches to all Defendants and the liability of each should be assigned according to its percentage of the market for AFFF-containing PFAS at issue in this Complaint. PFAS is fungible; it is impossible to identify the exact Defendant who manufactured any given batch of AFFF containing PFAS found free in the air, soil or groundwater, and each of these Defendants participated in a state-wide and national marked for AFFF containing PFAS during the relevant time.

155.    Concert of action liability attaches to all Defendants, each of which participated in a common plan to commit the torts alleged herein and each of which acted tortuously in pursuance of the common plan to knowingly manufacture and sell inherently dangerous AFFF-containing PFAS.

156.    Enterprise liability attaches to all the named Defendants for casting defective products into the stream of commerce.

## VIII.   CLASS ALLEGATIONS

157.    Plaintiffs request certification pursuant to Fed. R. Civ. P 23(b)(2) on behalf of a proposed damages class defined as follows: all individuals who from the early 1970s to present were exposed to drinking water contaminated with Defendants' AFFF containing PFAS used at WAFB, or who owned property impacted by the contamination and experienced injuries and damages to their person or property.

158.    In the alternative, Plaintiffs request certification pursuant to Fed. R. Civ. P 23(b)(3) on behalf of proposed injunctive relief classes defined as follows: all individuals and entities who from the early 1970s to present were exposed to drinking water contaminated with Defendants' AFFF containing PFAS used at WAFB or who owned property impacted by the contamination and experienced injuries and damages to their person or property.

159.    There are numerous questions of law and fact common to Plaintiffs and Class Members that predominate over any question affecting only individual Class Members. The answers to these common questions will advance resolution of the litigation as to all Class Members. Common legal and factual issues include:

    a.   Whether Defendants engaged in the conduct alleged herein.

b.  Whether Defendants knew or should have known that exposure to PFAS could increase health risks.

c.  Whether Defendants knew or should have known that their manufacture of AFFF containing PFAS was unreasonably dangerous.

d.  Whether Defendants knew or should have known that their AFFF contained persistent, stable, and mobile chemicals that were likely to contaminate groundwater water supplies.

e.  Whether Defendants failed to sufficiently warn of the potential for harm that resulted from use of their products.

f.  Whether Defendants became aware of health and environmental harm caused by PFOA and PFOS and failed to warn users and Plaintiffs and the Class of the harm.

g.  The extent to which Defendants knew about the PFAS contamination in the water and in the Areas of Investigation.

h.  The extent to which Defendants knew about the PFAS contamination in the water supply systems in the Areas of Investigation.

i.  The extent to which Defendants knew about the PFAS contamination in the water supplied to private wells of residents in the Areas of Investigation.

j.  Whether the Defendants owed a duty to the Plaintiffs and the Class to refrain from the actions that caused the contamination of the drinking water with PFAS.

k.  Whether Defendants made unlawful and misleading representation or material omissions with respect to the health impacts of PFAS.

l. For the Medical Monitoring Class, whether Plaintiffs and Class Members were exposed to water containing elevated levels of PFAS while living in Oscoda or WAFB.

m. Whether Plaintiffs and Class Members are entitled to damages and other monetary relief and other equitable reliefs and if so in what amount.

n. Whether Class members or Sub-Class members have sustained damages and the proper measure of damages.

o. Whether Defendants are strictly liable to Plaintiffs and the Class for their actions.

p. Whether Defendants are liable to Plaintiffs and the Class.

160. Excluded from the Class are:

a. Defendants, including any entity or division in which Defendants have a controlling interest, along with their legal representative, employees, officers, directors, assigns, heirs, successors, and wholly or partly owned subsidiaries or affiliates;

b. The Judge to whom this case is assigned, the Judge's staff, and the Judge's immediate family;

c. Any class counsel or their immediate family members; and

d. All governmental entities

161. Plaintiffs reserve the right to amend the Class definition if discovery and further investigation reveal that any Class should be expanded, divided into additional subclasses, or modified in any other way.

162.    The number of class members is sufficiently numerous to make class action status the most practical method for Plaintiffs to secure redress for injuries sustained and to obtain class wide equitable injunctive relief.

163.    There are questions of law and fact raised by the named Plaintiffs' claims common to those raised by the Class(es) they seek to represent. Such common questions predominate over question affecting only individual members of the Class(es).

164.    The deliberate and negligent conduct and resulting harms alleged by the named Plaintiffs are typical of the legal violations and harms suffered by all Class members. Plaintiff Class representatives will fairly and adequately protect the interests of the Plaintiff Class members.

165.    Plaintiffs' counsel are unaware of any conflicts of interest between the Class representatives and absent Class members with respect to the matters at issue in this litigation; the Class representatives will vigorously prosecute the suit on behalf of the Class; and the Class representatives are represented by experienced counsel. Plaintiffs are represented by attorneys with substantial experience and expertise in complex and class action litigation involving personal and property damage.

166.    Plaintiffs' attorneys have identified and thoroughly investigated all claims in this action and have committed sufficient resources to represent the Class.

167.    The maintenance of the action as a class action will be superior to other available methods of adjudication and will promote the convenient administration of justice. Moreover, the prosecution of separate actions by individual members of the Class could result in inconsistent or varying adjudications with respect to individual members of the Class and/or one or more of the Defendants.

168.    Defendants have acted or failed to act on grounds generally applicable to all Plaintiffs, necessitating declaratory and injunctive relief for the Class.

## IX.    CAUSES OF ACTION FOR CLASS ACTION AND INDVIDUAL CLAIMS

### A.    First Cause of Action: Negligence

169.    Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully stated herein.

170.    Defendants, each of them, knew or should have known that exposure to PFAS was hazardous to the environment and to human health.

171.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF, containing PFAS, was hazardous to human health, bioaccumulated in the blood, and caused serious health effects, including cancer.

172.    Defendants also knew or should have known that PFAS are highly soluble and mobile in water and are extremely persistent in the environment, and high likely to contaminate water supplies if released into the environment.

173.    Defendants knew or should have known that the manner in which they were manufacturing, marketing and selling AFFF, containing PFAS, would result in the contamination of private and municipal drinking water supplies in Oscoda, Michigan.

174.    Defendants owed a duty to Plaintiffs to act reasonably and no to place inherently dangerous AFFF into the marketplace when its release into the drinking water supplies was imminent and certain.

175.    Defendants marketed and sold their products with knowledge that AFFF containing large quantities of toxic PFAS would be used in training exercises and in emergency situations at military bases, including WAFB in such a manner that dangerous chemicals would be released into the environment.

176.    Defendants marketed and sold their products with knowledge that AFFF containing large quantities of toxic PFAS would be stored in fire suppressant systems and tanks on USAF bases and that such systems and storage were used and maintained in such a manner that dangerous chemicals would be released into the environment.

177.    Knowing of the dangerous and hazardous properties of AFFF and the manner in which AFFF would be used, stored and maintained at WAFB, it was foreseeable that AFFF would contaminate the surrounding environments, groundwater and drinking water supplies of Oscoda, Michigan as a result of the proximity of these communities to WAFB.

178.    Defendants therefore knew or should have known that safety precautions would be required to prevent the release of PFAS into the environment, groundwater and drinking water supplies.

179.    Defendants had a duty to provide adequate instructions, proper labeling, and sufficient warning regarding AFFF products.

180.    As manufacturers, Defendants were in the best position to provide adequate instructions, proper labeling, and sufficient warnings about their AFFF products.

181.    Considering the above factors related to risk, foreseeability, social utility, burden of guarding against the harm, and the practical consequences of placing that burden on the Defendants, the Defendants owed a cognizable duty to Plaintiffs and the Class not to contaminate their municipal and private well drinking water supplies and the surrounding environment and groundwater with AFFF, containing dangerous levels of PFAS.

182.    Defendants had a duty to warn of the hazards associated with AFFF, containing PFAS, entering and poisoning the environment and groundwater.

183.   Defendants, as manufacturers, marketers, and sellers of AFFF owed Plaintiffs and the Class a cognizable duty to exercise reasonable care to ensure that AFFF was manufactured, marketed, and sold in such a way as to ensure that the end users of AFFF were aware of the potential harm PFAS can cause to human health and the environment.

184.   Upon learning of the release of the contaminants, all Defendants owed Plaintiffs and the Class a duty to warn and notify Plaintiffs and the Class of the release of the contamination before it injured Plaintiffs and the Class and their property and/or to act reasonably to minimize the damage to Plaintiffs.

185.   Defendants breached their duty by allowing PFAS to be released into the municipal and private well drinking water supplies and through their failure to warn and notify the end users of AFFF of the danger that PFAS would enter the environment and groundwater.

186.   Defendants, negligently, grossly negligently, recklessly, willfully, wantonly, and/or intentionally breached their legal duties to the Plaintiffs and the Putative Class, causing the contamination of the municipal and private well drinking water supplies from which the Plaintiffs and class obtained their water.

187.   Defendants further breached the duties owed to the Plaintiffs and the Class by failing to take reasonable, adequate, and sufficient steps or actions to eliminate, correct, or remedy any contamination after it occurred.

188.   Defendants' failure to notify the Plaintiffs and the Class in a timely manner of the contamination of the municipal and private well drinking water supplies, and, consequently, the presence of PFAS in the real properties of Plaintiffs constitutes another breach of the duties that Defendants owed Plaintiffs and class.

189.    Defendants' breaches of their duties were direct and proximate causes of Plaintiffs' and the Class' injuries, damages, and the imminent, substantial, and impending harm to their health.

190.    Defendants' breaches of their duties caused the drinking water in both the municipal and private well supplies to become contaminated with unsafe and dangerous levels of PFAS.

191.    Further, Defendants' breach of their duty to timely notify the community and act reasonably in warning of the presence of PFAS in AFFF, Plaintiffs and the Class were forestalled from undertaking effective and immediate remedial measures, and Plaintiffs and the Class have expended and/or will be forced to expend significant resources to test, monitor, and remediate the effects of Defendants' negligence for many years.

192.    Plaintiffs and the Class suffered foreseeable injuries and damages as a proximate result of said Defendants' negligent breach of their duties as set forth above. At the time Defendants breached their duties to Plaintiffs and the Class, Defendants' acts and/or failures to act posed recognizable and foreseeable possibilities of danger to Plaintiffs and the Class so apparent as to entitle them to be protected against such actions or inactions.

193.    Accordingly, Plaintiffs and the Classes seek damages from Defendants, in an amount to be determined at trial, directly resulting from their injuries to their persons, in a sufficient amount to compensate them for the injuries and losses sustained and to restore Plaintiffs and the Class to their original position, including but not limited to injuries to persons, including the need for medical monitoring as an element of damages, and actual, consequential, and nominal damages, flowing from the negligence which are the natural and proximate result of Defendants conduct in an amount to be proved at trial.

**B.      Second Cause of Action: Products Liability-Failure to Warn**

194.      Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if full restated herein.

195.      At all times relevant, Defendants were in the business of designing, developing, engineering, manufacturing, refining, researching, testing, fabricating, selling, providing ad distributing AFFF.

196.      Defendants knew or should have known that exposure to PFAS, including PFOA and/or PFOS was toxic to the environment and human health.

197.      Defendants had a duty to provide reasonable instructions and adequate warnings about the risk of injury and hazardous nature of the product, as well as the harmful effects to human health and the environment posed by AFFF.

198.      Defendants knew or should have known that the distribution storage and use of AFFF would contaminate the environment and enter the water supply harming human health and the environment.

199.      These risks were not obvious to consumers and/or end-users.

200.      Instead, Defendants' actively concealed these risks from Plaintiffs' and Putative Class Members.

201.      Defendants breached their duty by failing to provide adequate warning, or any warning at all, that use of their products could result in toxic chemicals entering the Oscoda drinking water supply posing a substantial risk to human health.

202.      Defendants breached their duty, by failing to provide adequate warning, or any warning at all, that their product could result in contamination of the environment including: lakes, rivers, ponds, creeks as well as ground and surface water, sewer systems, and municipal

and private well drinking water supplies as well as animals ( including fish and deer) living or eating on them.

203.    Sufficient and adequate instructions or warnings would have greatly reduced or avoided the harms suffered by Plaintiff and Putative Class Members.

204.    As a direct and proximate result of Defendants' wrongful actions in failing to provide adequate instructions or warning as to the use and disposal of their products, Plaintiff and Putative Class Members have suffered damages in an amount to be determined at trial.

205.    Defendants acts were willful, wanton reckless and/or conducted with reckless indifference to the rights of Plaintiff and Putative Class Members.

**C.    Third Cause of Action Product Liability-Defective Design**

206.    Plaintiffs hereby repeat, re-allege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

207.    Defendants knew or should have known that exposure to PFAS was hazardous to the environment and to human health.

208.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF, containing PFAS, was hazardous to human health and the environment.

209.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF containing PFAS would result in the contamination of the municipal and private water supply as a result of its proximity to WAFB.

210.    Knowing of the dangerous and hazardous properties of the AFFF, Defendants could have manufactured, marketed, and sold alternative designs or formulations of AFFF that did not contain PFAS.

211.    These alternative designs and/or formulations were already available, practical, and technologically feasible.

212.    The use of these alternative designs would have reduced or prevented the reasonably foreseeable harm to persons and property caused by the Defendants' manufacture, marketing, and sale of AFFF that contained PFAS.

213.    The AFFF that was manufactured, marketed, and sold by the Defendants contained PFAS chemicals that were so toxic and dangerous to human health and the environment, mobile, and persistent, that the act of designing, formulating, manufacturing, marketing, and selling this product was unreasonably dangerous under the circumstances.

214.    Further, this contamination then led to the exposure and bioaccumulation of PFAS to the residents in the Communities and increased their risk of numerous diseases.

215.    The AFFF manufactured, marketed, and sold by the Defendants was defectively designed as the foreseeable risk of harm could have been reduced or eliminated by the adoption of a reasonable, alternative design that was not unreasonably dangerous.

216.    Defendants' defective design and formulation of AFFF was a direct and proximate cause of the environmental and health impacts from PFAS, that came from the use and storage of AFFF at WAFB.

217.    As a result of Defendants' defective design and formulation of AFFF, the resulting contamination, the Plaintiffs and the Classes have been injured in that their exposure to PFAS and potentially other toxic substances has caused them to develop illnesses associated with this exposure as more fully described and/or significantly increased their risk of developing those illnesses.

218.    As a result of Defendants' design and formulation of a defective product, Defendants are strictly liable in damages to the Plaintiffs and Putative Class Members.

219.    Defendants' acts were willful, wanton, reckless and/or conducted with a reckless indifference to the rights of Plaintiffs and Class Members.

## X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Putative Class demand judgement against Defendants, and each of them jointly and severally, and request the following relief from the Court:

e.   Certification of the proposed Class;

f.   A declaration that Defendants acted with negligence, gross negligence, and/or willful, wanton, and careless disregard for the health and safety of Plaintiffs and members of the Class;

g.   An order establishing a medical monitoring protocol for Plaintiffs and the Class;

h.   An award to Plaintiffs and the Class of general, compensatory, exemplary, consequential and nominal damages;

i.   An order for an award of attorney fees and costs, as provided by law;

j.   Pre-judgement and post-judgment interest as provided by law; and

k.   An order for all such other relief the Court deems just and proper.

### <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury of any and all issues in this matter so triable pursuant to Federal Rule of Civil Procedure 38(b).

Respectfully submitted,

**NAPOLI SHKOLNIK PLLC**

/s/ Hunter J. Shkolnik, Esq.
Hunter J. Shkolnik Esq.
Paul J. Napoli, Esq.

Tate J. Kunkle, Esq. (*PHV Forthcoming*)
Patrick J. Lanciotti, Esq. (*PHV Forthcoming*)
NAPOLI SHKOLNIK PLLC
360 Lexington Ave., 11th Floor
New York, NY, 10017
Tel: (212) 397-1000
Fax: (646) 843-7603
pnapoli@napolilaw.com
tkunkle@napolilaw.com
planciotti@napolilaw.com
*Attorneys for the Plaintiff*